**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**

MICHELLE SCHRIVER, CAROLINA )     <u>CLASS ACTION</u>
GONZALEZ, ACHOREA TISDALE, and )
TRACY ALLISON, individually and on )     **JURY TRIAL DEMANDED**
behalf of all others similarly situated, )
                              )
                Plaintiffs, )
                              )
      vs. )
                              )
UNILEVER UNITED STATES, INC., )
                              )
                Defendant. )
                              )
_____ )

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Michelle Schriver, Carolina Gonzalez, Achorea Tisdale, and Tracy Allison (together, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated, against Defendant Unilever United States, Inc. ("Unilever" or "Defendant"). Plaintiffs make the following allegations based upon (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## <u>NATURE OF THE ACTION</u>

1.     This is a class action lawsuit by Plaintiffs, and others similarly situated, who purchased for normal household use Defendant's dry shampoo products that are defective because they contain benzene, a known human carcinogen, and which were formulated, designed, manufactured, marketed, advertised, distributed, and sold by Defendant.

2.     Defendant distributes, markets, and sells to consumers across the United States, both in retail establishments and online, including in Florida, certain dry shampoo products under

its various brands, including Suave, TIGI, TRESemmé, Dove, Nexxus, and Living Proof (the "Products").

3.    The presence of benzene in the Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

4.    Given the highly dangerous levels of benzene recently found in some of its competitors' aerosol products, as well as Unilever's need to recall certain of its own aerosol spray deodorant products due to the presence of benzene, Unilever knew or should have known of the dangerous and carcinogenic effects of benzene and should have known that it was producing products that contained, or had a material risk of containing, benzene.

5.    Instead of disclosing this fact to consumers, Defendant represented that its Products are safe and effective for their intended use, touting its "strict quality controls" to "limit the presence of benzene" in its products.[1] Nevertheless, Unilever has produced, marketed, labeled, distributed, and sold millions of dry shampoo Products that contained, or had a material risk of containing, benzene.

6.    The presence of benzene in Defendant's Products was not disclosed to consumers in the Products' labeling, advertising or otherwise, in violation of state and federal law. Plaintiffs and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and seek injunctive relief and restitution for the full purchase price of the Products. Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

---

[1] *See* https://www.unilever.com/brands/whats-in-our-products/your-ingredient-questions-answered/controlling-impurities/ (last visited Nov. 9, 2022).

discovery.

## <u>JURISDICTION AND VENUE</u>

7.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because at least one putative class member is of diverse citizenship from Defendant, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

8.     The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the privilege of conducting business activities in the state of Florida. Defendant has marketed, promoted, distributed, and sold the Products in Florida, and Defendant has sufficient minimum contacts with this state and/or sufficiently availed itself of the markets in this state through promotion, sales, distribution, and marketing to render the exercise of jurisdiction by this Court permissible.

9.     Venue is proper in this District, pursuant to 28 U.S.C. §1391, because a substantial part of the acts or omissions giving rise to the claims brought herein occurred or emanated within this District, Defendant has marketed, advertised, and sold the Products in this District, and Defendant has caused harm to class members who reside in this District.  In addition, two of the Plaintiffs are residents of this District.

## <u>PARTIES</u>

10.     At all relevant times, Plaintiff Michelle Schriver (for purposes of this paragraph, "Plaintiff") was a citizen and resident of West Palm Beach, Florida. Plaintiff has purchased for household use Defendant's Products, including Dove Dry Shampoo Volume and Fullness, for approximately 3 years. Plaintiff purchased 3-packs of the Product every 3 months on amazon.com. She received her last shipment in September 2021. She spent approximately $14 on each 3-pack of the Product. Based on the false and misleading claims by Defendant, at the time of purchase,

Plaintiff was unaware that Defendant's Products were adulterated with benzene. Plaintiff purchased Defendant's Products on the assumption that the labeling of Defendant's Products was accurate and that the products were unadulterated, safe, and effective. Plaintiff would not have purchased Defendant's Products had she known they contained benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase Products she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

11.     At all relevant times, Plaintiff Carolina Gonzalez (for purposes of this paragraph, "Plaintiff") was a citizen and resident of Miami, Florida. Plaintiff has purchased for household use Defendant's Products, including TIGI Bed Head Matte Dry Shampoo for women, Oh Bee Hive!, from amazon.com in November 2020. She has spent approximately $10 on Defendant's Products. Based on the false and misleading claims by Defendant, at the time of purchase, Plaintiff was unaware that Defendant's Products were adulterated with benzene. Plaintiff purchased Defendant's Products on the assumption that the labeling of Defendant's Products was accurate and that the products were unadulterated, safe, and effective. Plaintiff would not have purchased Defendant's Products had she known they contained benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase Products she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

12.     At all relevant times, Plaintiff Achorea Tisdale (for purposes of this paragraph, "Plaintiff") was a citizen and resident of Sacramento, California. Plaintiff has purchased for household use Defendant's Products approximately every 2 months for approximately the past 2 years, including Dove Dry Shampoo Volume and Fullness, which she purchased at Target on November 19, 2021. Plaintiff has purchased Defendants product at Target and Walmart in Sacramento, California. She has spent approximately $5-10 on each one of Defendant's Products.

Based on the false and misleading claims by Defendant, at the time of purchase, Plaintiff was unaware that Defendant's Products were adulterated with benzene. Plaintiff purchased Defendant's Products on the assumption that the labeling of Defendant's Products was accurate and that the products were unadulterated, safe, and effective. Plaintiff would not have purchased Defendant's Products had she known they contained benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase Products she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

13.    At all relevant times, Plaintiff Tracy Allison (for purposes of this paragraph, "Plaintiff") was a citizen and resident of Champaign, Illinois. Plaintiff has purchased for household use Dove Dry Shampoo Volume and Fullness twice on amazon.com, the first time on February 14, 2021, and the second time on September 3, 2021.  She has spent an approximate total of $20 on Defendant's Products. Based on the false and misleading claims by Defendant, at the time of purchase, Plaintiff was unaware that Defendant's Products were adulterated with benzene. Plaintiff purchased Defendant's Products on the assumption that the labeling of Defendant's Products was accurate and that the products were unadulterated, safe, and effective. Plaintiff would not have purchased Defendant's Products had she known they contained benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase Products she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

14.    Defendant is a Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey. Defendant sells dry shampoo Products throughout the United States, including in the state of Florida.

15.    Defendant is part of the Unilever Group, an international consumer goods company that is comprised of two parent companies, Unilever N.V. in Rotterdam, Netherlands and Unilever

PLC in London, United Kingdom. The Unilever Group operates in the United States under its subsidiary, Unilever United States, Inc., which operates as a single economic entity.

## **FACTUAL ALLEGATIONS**

16.     Upon information and belief, Defendant sells and markets its Products under the names Suave, TIGI, TRESemmé, Dove, Nexxus, and Living Proof. Each product is marketed in the same or similar manner in that (i) it is a dry shampoo, (ii) it misrepresents or fails to disclose the presence of benzene (or the risk of the Product containing the same), and (iii) Defendant makes similar representations regarding the quality and safety of the Products.

17.     Dry shampoo products, including the Products, are considered cosmetics that are regulated by the U.S. Food & Drug Administration ("FDA"). The Food, Drug, and Cosmetic Act ("FDCA") defines cosmetics by their intended use, as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body . . . for cleansing, beautifying, promoting attractiveness, or altering the appearance[.]" FDCA § 201(i).

18.     The FDA acknowledges that "[c]osmetic companies have a legal responsibility for the safety of their products and ingredients."[2]

19.     The FDA recognizes the high danger of the chemical benzene and lists it as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity. . . However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million ("ppm").[3]

---

[2] Cosmetic Safety Q&A: Personal Care Products (https://www.fda.gov/cosmetics/resources-consumers-cosmetics/cosmetics-safety-qa-personal-care-products#:~:text=Cosmetic%20companies%20have%20a%20legal,product%20affects%20how%20you%20look) (last visited Nov. 10, 2022).
[3] Food and Drug Administration, Q3C – Tables and List Guidance for Industry (2018) (https://www.fda.gov/media/133650/download) (last visited Nov. 10, 2022).

20.     Since the Products are *not* drugs, *any* amount of the benzene is unacceptable and should not be employed in the manufacture of the Products.

21.     Benzene is used primarily in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

22.     According to the National Toxicology Program ("NTP"), benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[4] Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC").[5] Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[6] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on sufficient evidence of carcinogenicity in humans, sufficient evidence of carcinogenicity in experimental animals, and strong mechanistic evidence. . . . In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[7]

23.     The Centers for Disease Control and Prevention ("CDC") states that the

---

[4] Benzene, Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016) (https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf) (last visited Nov. 10, 2022) (emphasis in original).
[5] Benzene, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018) (https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a0 94f45da6d27cc.pdf) (last visited Nov. 10, 2022).
[6] *Id.*
[7] *Id.* (emphasis in original).

Department of Health and Human Services has determined that benzene causes cancer in humans.[8] The World Health Organization ("WHO") and the IARC have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[9]

24.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[10]

25.     The Environmental Protection Agency ("EPA") has estimated that lifetime exposure to benzene inhalation at 0.4 parts per billion ("ppb"), or 0.0004 ppm, will increase the risk of developing cancer in humans at the same 1 in 100,000 exposed persons rate as FDA uses to set regulatory limits on other trace impurities like N-nitrosamines.[11]

26.     The FDA instructs that there is no safe level of benzene, and thus it "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its]

---

[8] *See* Centers for Disease Control and Prevention, Facts About Benzene (2018) (https://emergency.cdc.gov/agent/benzene/basics/facts.asp) (last visited Nov. 10, 2022).
[9] *See* International Agency for Research on Cancer and World Health Organization, IARC Monographs on the Identification of Carcinogenic Hazards to Humans (https://monographs.iarc.who.int/list-of-classifications) (last visited Nov. 10, 2022).
[10] *See* Centers for Disease Control and Prevention, The National Institute for Occupational Safety and Health (NIOSH), Benzene (October 30, 2019) (https://www.cdc.gov/niosh/npg/npgd0049.html) (last visited Nov. 10, 2022); Centers for Disease Control and Prevention, The National Institute for Occupational Safety and Health, BENZENE: Systemic Agent (2011) (https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750032.html) (last visited Nov. 10, 2022).
[11] *See* Environmental Protection Agency, Benzene; CASRN 71-43-2 (https://iris.epa.gov/static/pdfs/0276_summary.pdf) (last visited Nov. 10, 2022); Food and Drug Administration (February 2021), Control of Nitrosamine Impurities in Human Drugs (https://www.fda.gov/media/141720/download) (last visited Nov. 10, 2022).

unacceptable toxicity."[12]

27.    As previously stated, the Products are cosmetics. Among the ways a cosmetic may be adulterated are:

> If it consists in whole or in part of any filthy, putrid, or decomposed substance; or . . . whereby it may have been rendered injurious to health;[13]

28.    A cosmetic is misbranded "[i]f its labeling is false or misleading in any particular."[14]

29.    The manufacture of any misbranded or adulterated cosmetic is prohibited under federal law,[15] and state laws including Florida.[16] The introduction into commerce of any misbranded or adulterated cosmetic is similarly prohibited.[17] The receipt in interstate commerce of any adulterated or misbranded cosmetic is also unlawful.[18]

30.    In October 2022, Unilever announced that "select lot codes of dry shampoo aerosol products produced prior to October 2021 from Dove, Nexxus, Suave, TIGI (Rockaholic and Bed

---

[12]    FDA,    Q3C–2017    Tables    and    List    Guidance    for    Industry (https://www.fda.gov/media/71737/download) (last visited Nov. 10, 2022).

[13] 21 U.S.C. §351(a)(2)(B); *see also* Fla. Stat. § 499.006(1) & (2) ("A drug or device is adulterated, if any of the following apply: (1) It consists in whole or in part of any filthy, putrid, or decomposed substance[;] (2) It has been produced, prepared, packed, or held under conditions whereby it could have been contaminated with filth or rendered injurious to health.").

[14] 21 U.S.C. §352(a)(1); *see also* Fla. Stat. § 499.007(1) (A drug is misbranded "[i]f its labeling is in any way false or misleading.")

[15] 21 U.S.C § 331(g).

[16] *See* Fla. Stat. § 499.005(1) ("It is unlawful for a person to perform or cause the performance of any of the following acts in this state: (1) The manufacture, repackaging, sale, delivery, or holding or offering for sale of any drug, device, or cosmetic that is adulterated or misbranded or has otherwise been rendered unfit for human or animal use.").

[17] 21 U.S.C. §331(a); Fla. Stat. § 499.005(1).

[18] 21 U.S.C. §331(c); *see also* Fla. Stat. § 499.005(3)("It is unlawful for a person to perform or cause the performance of any of the following acts in this state: … (3) The receipt of any drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery of such drug, device, or cosmetic, for pay or otherwise.").

Head), and TRESemmé" were being recalled "due to potentially elevated levels of benzene." Unilever instructed consumers to "stop using the affected aerosol dry shampoo products."[19]

31.    As a result of benzene contamination in the Products, they are considered adulterated and misbranded. Defendant did not disclose that benzene, a known human carcinogen, is present in the Products purchased by Plaintiffs and the putative class members.

32.    Defendant's failure to control for benzene contamination and failure to disclose the risks of benzene in its adulterated Products constitutes unfair and deceptive conduct.

33.    Defendant's recall of the Products is wholly inadequate where, among other things: (a) it is limited to products purchased *before* October 2021, even though products sold after this date likely continue to be contaminated; (b) it is limited to only specific lots of the Products; (c) to get compensation under the recall, consumers are required to have proof of purchase, which is unlikely for disposable products bought at retail stores that are over a year old; (d) although Defendant states "[a]n internal investigation identified the propellant as the source, and Unilever has worked with its propellant suppliers to address this issue,"[20] this is not useful to consumers who already used and were exposed to Defendant's dangerous products.

34.    Unilever knew the risk of its Products being contaminated with benzene at least as early as July 2021. Around that time, Unilever's top competitors began recalling aerosol products due to the presence of benzene and faced litigation based on those recalls. Also, in November 2021, Valisure, an independent laboratory, confirmed the presence of benzene in dozens of aerosol antiperspirants and sunscreens and submitted a citizens' petition to the Food and Drug Administration describing those findings, including that two of Unilever's Suave antiperspirants

---

[19] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-us-recall-select-dry-shampoos-due-potential-presence-benzene (last visited Nov. 9, 2022).
[20] https://www.unileverrecall.com/ (last visited Nov. 9, 2022).

contained benzene. Unilever ultimately faced numerous lawsuits arising from the Suave contamination beginning in late 2021.

35.    In December 2021, following the discovery of benzene in certain aerosol spray sunscreens made by various companies, as well as further investigations into the use of aerosol as presenting a specific risk, Unilever responded to an inquiry by Forbes magazine: "Unilever said in an emailed statement it conducted a 'robust investigation' of its antiperspirants and deodorants and is confident in their safety."[21]

36.    In March 2022, Unilever announced the decision to recall several Suave deodorant products due to the presence of benzene, which the company acknowledged is a "human carcinogen" that "can result in cancers including Leukemia and blood cancer of the bone marrow and blood disorders which can be life threatening."[22]

37.    Unilever attributed the presence of benzene in its Suave deodorant products to the fact that they were aerosol spray products (like Defendant's dry shampoo Products), and stated that Benzene is not an ingredient: "While benzene is not an ingredient in any of the recalled products, the review showed that unexpected levels of benzene came from the propellant that sprays the product out of the can."[23]

38.    Also, on October 31, 2022, Valisure again petitioned the FDA to address dangerous levels of benzene in consumer products, this time focusing on dry shampoo products.[24] Valisure

---

[21] https://www.bloomberg.com/news/articles/2021-12-29/toxins-in-household-products-leave-fda-chasing-a-vapor-trail (last visited Nov. 9, 2022).
[22] https://www.unileverusa.com/news/press-releases/2022/unilever-issues-voluntary-nationwide-recall-of-suave-24hour/ (last visited Nov. 9, 2022).
[23] *Id*.
[24] *See* Valisure Citizen Petition on Benzene in Dry Shampoo Products ("Citizens Petition") at 1 (available at https://assets-global.website-files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citiz

found that numerous dry shampoo products contain benzene in amounts well over the 2 ppm threshold permitted for certain drugs.[25]

39.     In its October 31, 2022 Citizen Petition, Valisure shows data from the analysis of benzene by directly sampling contaminated air after spraying dry shampoo products, which suggests potential for short- and long-term inhalation exposure to high levels of benzene.[26] The presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling.[27]

40.     Given that dry shampoos are cosmetics – *not* drugs – these results are even more concerning. Because dry shampoo products contain no active pharmaceutical ingredient for therapeutic purpose, the presence of benzene at these levels is unacceptable.[28]

41.     Despite knowing the significant probability that the Products contain benzene, Unilever represented to Plaintiff and putative class members that its Products are healthy and safe. In fact, in Unilever's labeling and product packaging, and in its advertising – including on its website and online – Unilever promotes and indeed instructs that the Products are not just for occasional use but also for *daily* (and regular, repeated) use.[29]

---

en%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf) (last visited November 1, 2022).
[25] *Id.* at 2, 13-17.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] https://www.suave.com/us/en/products/hair-refresher-dry-shampoo.html (last visited Nov. 9, 2022).

42.     On its website, Unilever declares: "Product safety is our top priority. Our home and personal care products are used every day by millions of people around the world. People trust us to provide them with products that are safe for them, their families and the environment."[30]

43.     Moreover, Unilever states on its website:

At a minimum we ensure our products comply with applicable laws. In several areas we set our standards higher than those required by law. When this happens [,] we also expect our suppliers and partners to meet these standards. Similarly, when we take on a new brand or a new company we work to ensure they meet our standards as soon as possible.[31]

44.     Unilever brand Dove touts its robust commitment to consumer health: "We care about our customers and the environment, so our products are as safe as they are caring. We want to give our customers the best experience using our products, so our ingredients always comply with regulations and meet our safety and environmental standards (which often go beyond regulatory requirements)."[32]

45.     Unilever specifically represents that its products are safe from benzene, stating on its website: "we have strict quality controls in place that limit the presence of benzene in our products so that any traces found fall within safe levels."[33]

46.     Defendant advertised and sold the Products without labeling indicating to consumers that they contain benzene. The following image is illustrative of the labels contained on the Products purchased by Plaintiffs and putative class members. Plaintiffs note that while the labeling contains "Warnings," none of them are for the presence of a carcinogenic ingredient:

---

[30]   https://www.unilever.com/brands/whats-in-our-products/how-do-we-choose-our-ingredients/ (last visited Nov. 9, 2022).
[31]   *Id.*
[32]   https://www.dove.com/us/en/secure/contactus/faq.html (last visited Nov. 9, 2022).
[33]   https://www.unilever.com/brands/whats-in-our-products/your-ingredient-questions-answered/controlling-impurities/ (last visited Nov. 9, 2022).






47.     Plaintiffs and putative class members bargained for a dry shampoo free of contaminants and dangerous substances and were deprived the basis of their bargain when Defendant sold them a product containing the carcinogen benzene, which rendered the Products unmerchantable and unfit for use.

48.     Plaintiffs and putative class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain the known human carcinogen, benzene, and are not fit for use by humans. Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

49.     Plaintiffs have standing to represent members of the putative class because there is sufficient similarity between the specific Products purchased by Plaintiffs and the other Products not purchased by Plaintiffs. Specifically, each and every one of Defendant's Products (i) are marketed in substantially the same way—as dry shampoo— and (ii) fail to include labeling

indicating to consumers that the Products contain the known human carcinogen, benzene, at levels that are dangerous to human health when used as directed. Accordingly, the misleading effect of all of the Products' labels are substantially the same.

50.     Had Plaintiffs and members of the putative class known that any of the Products were contaminated with benzene, a known human carcinogen, they would not have purchased any of Defendant's Products. Thus, Plaintiffs and members of the putative class have "lost money" by purchasing products they would not have otherwise purchased but for Defendant's misrepresentations and omissions. As a result, Plaintiffs and members of the putative class have Article III standing.

## CLASS ALLEGATIONS

51.     Plaintiffs bring this action pursuant to Rule 23(a), 23(b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the following class (the "Class") and subclasses (collectively referred to as the "Subclasses") defined as:

**Class:**

All persons in the United States (including its Territories and the District of Columbia) who purchased any Products for personal use or consumption.

**California Subclass:**

All persons in the state of California who purchased any Products for personal use or consumption.

**Florida Subclass:**

All persons in the state of Florida who purchased any Products for personal use or consumption.

**<u>Illinois Subclass:</u>**

All persons in the state of Illinois who purchased any Products for personal use or consumption.

52.      Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Classes may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the proposed Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

53.      Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

54.      ***Numerosity.*** Rule 23(a)(1) of the Federal Rules of Civil Procedure:  The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Classes contain many tens or hundreds of thousands of members. The precise number of Class members is unknown to Plaintiffs at this time.

55.      ***Commonality and Predominance.*** Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure:  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

         a.      Whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

- 17 -

b.      Whether Defendant's conduct was unfair and/or deceptive;

c.      Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Class;

d.      Whether Defendant breached an express warranty;

e.      Whether Defendant breached an implied warranty;

f.      Whether Plaintiffs and the Class have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages; and

g.      Whether an injunction is necessary to prevent Defendant from continuing to market and sell defective and adulterated Products that contain benzene, a known human carcinogen.

56.     *Typicality.*  Rule 23(a)(3) of the Federal Rules of Civil Procedure:  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendant's uniform misconduct described above and were subject to Defendant's deceptive claims that accompanied each and every Product in Defendant's collection. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all putative Class members.

57.     *Adequacy*.  Rule 23(a)(4) of the Federal Rules of Civil Procedure:  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

58.     ***Declaratory Relief.***   Rule 23(b)(2) of the Federal Rules of Civil Procedure: Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to the Classes as a whole.

59.     Plaintiffs seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell Products that are adulterated with benzene, and requiring Defendant to provide a full refund of the purchase price of the Products to Plaintiffs and Class members.

60.     Unless a class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiffs and the Class members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

61.     ***Superiority***.   Rule 23(b)(3) of the Federal Rules of Civil Procedure:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single

court.

## CAUSES OF ACTION

### COUNT I

### Breach of Express Warranty
**(On Behalf of the Class, or Alternatively, the Subclasses)**

62.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

63.    Plaintiffs bring this claim on behalf of themselves and the Classes against Defendant.

64.    Plaintiffs and each Class member purchased Defendant's Products from common retail settings. There was no learned intermediary between the manufacturer and the end-purchaser at the time of purchase and the express warranties were on the Product packaging, labeling, and via direct-to-consumer advertising.

65.    Plaintiffs and each Class member formed a contract with Defendant at the time Plaintiffs and the other Class members purchased Defendant's Products. The terms of the contract include the promises and affirmations and omissions of fact made by Defendant on its Product packaging, labeling, and through marketing and advertising. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract that Defendant entered into with Plaintiffs and each Class member.

66.    Defendant expressly warranted that its Products were fit for their ordinary use (i.e., as a safe product suitable for human application) are not just for occasional use but also for *daily* (and regular, repeated) use.[34]    Defendant expressly warrants that its products are safe from

---

[34] https://www.suave.com/us/en/products/hair-refresher-dry-shampoo.html (last visited Nov. 9, 2022).

benzene, stating on its website: "we have strict quality controls in place that limit the presence of benzene in our products so that any traces found fall within safe levels."[35]

67.    Plaintiffs and each Class member read and relied on one or more of the express warranties provided by Defendant in the labeling, packaging, and written advertisements in deciding to purchase the Products.

68.    Defendant's Products did not conform to Defendant's express representations and warranties because they were not manufactured in compliance applicable standards, were not suitable for human application, and were adulterated and misbranded.

69.    At all times relevant all the following States and Territories have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. Code. § 2-313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. § 26-1- 2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2- 313; Mont. Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382- A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, et seq.; R.I. Gen.

---

[35] https://www.unilever.com/brands/whats-in-our-products/your-ingredient-questions-answered/controlling-impurities/ (last visited Nov. 9, 2022).

Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A2-313; Va. Code § 8.2- 313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313 and Wyo. Stat. § 34.1-2-313.

70.    At the time that Defendant marketed and sold its Products, it recognized the purposes for which the products would be used, and expressly warranted the products were suitable for human application and not adulterated or misbranded. These affirmative representations became part of the basis of the bargain in every purchase by Plaintiffs and each Class member.

71.    Plaintiffs and each Class member are natural persons who are reasonably expected to use, consume, or be affected by the adulterated and/or misbranded Products manufactured and sold by Defendant.

72.    Defendant breached its express warranties with respect to its Products because the products were not suitable for human application because they were adulterated with benzene and misbranded.

73.    Plaintiffs and each Class member would not have purchased the Products had they known the products contained benzene, were not suitable for human application, did not comply with applicable standards, and/or were adulterated and misbranded.

74.    As a direct and proximate result of Defendant's breach of express warranty, Plaintiffs and other Class members have been injured and suffered damages in the amount of the purchase price of their Products, and any consequential damages resulting from the purchases, in that the Products they purchased were so inherently flawed, unfit, or unmerchantable as to have no market value.

## COUNT II

### Breach of the Implied Warranty
### (On Behalf of the Class, or Alternatively, the Subclasses)

75.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

76.     Plaintiffs bring this claim on behalf of themselves and the against Defendant.

77.     Defendant was at all relevant times the manufacturer, distributor, warrantor and/or seller of the Products. Defendant knew or had reason to know of the specific use for which its Products were purchased.

78.     Because the Products contain benzene, they were not of the same quality as those generally acceptable in the trade and were not fit for the ordinary purposes for which such Products are used.

79.     Plaintiffs and members of the Class purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

80.     The Products were not altered by Plaintiffs or members of the Class.

81.     Plaintiffs and members of the Class were foreseeable users of the Products.

82.     Plaintiffs and members of the Class used the Products in the manner intended.

83.     As alleged, the Products were not adequately labeled and did not disclose that they contain benzene.

84.     The Products did not measure up to the promises stated in the written literature, media advertisement and communications by and from Defendant.

85.     Defendant impliedly warranted that the Products were merchantable, fit, and safe for ordinary use.  On its website, Unilever declares: "Product safety is our top priority. Our home and personal care products are used every day by millions of people around the world. People trust

us to provide them with products that are safe for them, their families and the environment." And: "At a minimum we ensure our products comply with applicable laws. In several areas we set our standards higher than those required by law. When this happens [,] we also expect our suppliers and partners to meet these standards. Similarly, when we take on a new brand or a new company we work to ensure they meet our standards as soon as possible."[36]

86.    Defendant further impliedly warranted that the Products were fit for the particular purposes for which they were intended and sold. At the time Defendant marketed and otherwise placed its Products into the stream of commerce, it knew of the particular purpose for which Plaintiffs and the Class members purchased the Products—to have a safe and effective dry shampoo—which did not contain any dangerous carcinogens. Defendant also knew that consumers, including Plaintiffs and members of the Class, would have no ability or opportunity to determine the ingredients in the Products, but instead would rely on Defendant's representations that the Products were suitable for their particular purpose and free of dangerous carcinogens (i.e., benzene).

87.    Contrary to these implied warranties, the Products were defective, unmerchantable, and unfit for their ordinary use when sold, and unfit for the particular purpose for which they were sold.

88.    Further, as the intended consumers and ultimate users of the Products, Plaintiffs and the Class members are intended third-party beneficiaries of any contracts between Defendant and any retailers from whom Plaintiffs obtained Products, which contain the implied warranty of merchantability and to be fit for ordinary purposes, safe, and not hazardous to one's health.

---

[36]    https://www.unilever.com/brands/whats-in-our-products/how-do-we-choose-our-ingredients/ (last visited Nov. 9, 2022).

Plaintiffs and the Class members, not any retailers, are the parties intended to benefit by any such contract because they are the people using the Products in the manner intended.

89.     In breach of the implied warranty of merchantability, the Products that Defendant provided to Plaintiffs and the Class members are not fit and suitable for their ordinary purpose because, *inter alia*, they contain a dangerous carcinogen with the potential of causing serious injury and/or death. Defendant's Products supplied to Plaintiffs and the Class members did not possess the basic degree of fitness for ordinary use due to the defects described herein. The defects are so basic that they render the Products unfit for their ordinary purposes. As such, they are not merchantable.

90.     As a direct and proximate result of Defendant's breach, Plaintiffs and the Class members have suffered, and will continue to suffer, significant damages, loss and injury in an amount that will be established at trial.

## COUNT III

### Unjust Enrichment
**(On Behalf of the Class, or Alternatively, the Subclasses)**

91.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

92.     Plaintiffs bring this claim on behalf of themselves and the Classes against Defendant.

93.     Plaintiffs, and the other members of the Class, conferred benefits on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

94.     Defendant voluntarily accepted and retained this benefit.

95.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

96.     Defendant received benefits in the form of revenues from purchases of the Products to the detriment of Plaintiffs, and the other members of the Class, because Plaintiffs, and members of the Class, purchased mislabeled products that were not what they bargained for and were not safe and effective, as claimed.

97.     Defendant was unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiffs and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs, and members of the Class, because they would have not purchased the Products had they known the true facts.

98.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

## COUNT IV

### Violation of the California False Advertising Law
(CAL BUS. & PROF. CODE §§ 17500 *et seq.*)
**On Behalf of the California Subclass**

99.     Plaintiff Tisdale realleges and incorporates by reference all preceding allegations as though fully set forth herein.

100.     Plaintiff Tisdale brings this claim on behalf of herself and the California Subclass members against Defendant.

101.    California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

102.    Defendant's untrue and misleading statements significantly impacted the public because Defendant sells the Products nationwide, including in California, and there are hundreds of thousands of consumers of the Products, including Plaintiff Tisdale and the California Subclass

103.    As set forth herein, Defendant's claims that the Products were and are safe for use by individuals were false because the Products in fact contain or have material risk of containing an unsafe chemical, benzene, which could cause a user to suffer adverse health effects from use of the Products and were likely to deceive the public.

104.    Defendant's claims that the Products were and are safe for use by individuals were and are untrue and misleading because they failed to mention the presence of an unsafe chemical, benzene, which could cause a Product user to suffer adverse health effects from use of the Products.

105.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained or had a material risk of containing carcinogenic benzene.

106.    Defendant knew, or reasonably should have known, that all these claims were untrue or misleading and likely to deceive the public.

107.    As a direct and proximate result of Defendant's false advertising, Plaintiff Tisdale and the California Subclass have been harmed, and that harm will continue unless Defendant is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Products.

108.    As a direct and proximate result of Defendant's false advertising, Plaintiff Tisdale and the California Subclass suffered damages by purchasing the Products because they received a product that was essentially or completely worthless because it contains, or has a material risk of containing, carcinogenic benzene, and they would not have purchased or would have paid less for the Products had they known this fact.

109.    Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the other California Subclass members. Plaintiff has suffered injury in fact as a result of Defendant's unlawful conduct, including economic injury.

110.    In addition, Defendant's unlawful conduct is continuing, with no indication of Defendant's intent to cease this fraudulent course of conduct, posing a threat of future harm to Plaintiff Tisdale and the California Subclass, such that prospective injunctive relief is necessary. Plaintiffs and the California Subclass are entitled to injunctive and equitable relief and restitution in the amount they spent on the Products, as well as any other just and proper relief, pursuant to Cal. Bus. & Prof. Code § 17535 and applicable law.

## COUNT V

### Violation of the California Unfair Competition Law
(Cal. Bus. & Prof. Code § 17200 *et seq.*)
**On Behalf of the California Subclass**

111.    Plaintiff Tisdale realleges and incorporates by reference all preceding allegations as though fully set forth herein.

112.    Plaintiff Tisdale brings this claim on behalf of herself and the California Subclass members against Defendant.

113.    The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

114.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

115.    For the reasons discussed herein, Defendant violated and continues to violate the California UCL by engaging in the herein described deceptive and unfair acts or practices proscribed by Cal. Bus. & Prof. Code § 17200 *et seq.* Defendant's acts and practices were likely to, and in fact did, deceive and mislead members of public, including consumers acting reasonably under the circumstances, to their detriment.

116.    Defendant deceptively represented that the Products were and are safe for use by individuals when in fact they contain, or have a material risk of containing, an unsafe chemical, benzene, which could cause a Product user to develop cancer from the use of the Products.

117.    Defendant has engaged in "unlawful" business practices by violating multiple laws, including the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*; the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*; and The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*

118.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

119.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is also "unfair" because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including but not limited to the California Consumers Legal Remedies Act, the California False Advertising Law, and the Federal Food, Drug, and Cosmetic Act.

120.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is also "unfair" because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, themselves, can reasonably avoid.

121.    A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

122.    As set forth herein, Defendant's claims relating the representations and omissions stated on the Products' labeling and marketing statements mislead reasonable consumers regarding the presence of benzene in the Products.

123.    Defendant profited from its sale of the falsely, deceptively, and unlawfully advertised the Products to unsuspecting consumers, including Plaintiff Tisdale and the California Subclass members.

124.    Defendant acted intentionally, knowingly, and maliciously to violate California's UCL, and recklessly disregarded Plaintiffs' and the California Subclass members' rights. Highly dangerous levels of benzene recently found in some of Defendant's competitors' aerosol products, as well as Defendant's need to recall certain of its own aerosol spray deodorant products due to the presence of benzene, put Defendant on notice of benzene contamination of its Products.

125.    As a direct and proximate result of Defendant's false advertising, Plaintiff Tisdale and the California Subclass have been harmed, and that harm will continue unless Defendant is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Products.

126.    As a direct and proximate result of Defendant's fraudulent, unfair, and unlawful practices, Plaintiff Tisdale and California Subclass suffered damages by purchasing the Products

because they received a product that was essentially or entirely worthless because it contains, or has a material risk of containing, a carcinogenic compound, benzene, and they would not have purchased or would have paid less for the Products had they known this fact.

127.   Defendant's fraudulent, unfair, and unlawful practices Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the other California Subclass Members. Plaintiff has suffered injury in fact as a result of Defendant's unlawful conduct, including economic injury.

128.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff Tisdale and the California Subclass seek an order enjoining Defendant from continuing to conduct business through deceptive, unfair, or unlawful acts and practices.  Defendant's misconduct is continuing, with no indication of Defendant's intent to cease this deceptive, unlawful, and unfair course of conduct, posing a threat of future harm to Plaintiff Tisdale and the California Subclass, such that prospective injunctive relief is necessary.

129.   Plaintiff Tisdale and the California Subclass also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of deceptive, unfair, or unlawful acts and practices, as well as any other just and proper relief pursuant to Cal. Bus. & Prof. Code § 17203 and applicable law.

### COUNT VI

### <u>Violation of the Florida Deceptive and Unfair Trade Practices Act</u>
### (FLA. STAT. §§ 501.201 *et seq.*)
### On Behalf of the Florida Subclass

130.   Plaintiffs Schriver and Gonzalez reallege and incorporate by reference all preceding allegations as though fully set forth herein.

131.    Plaintiffs Schriver and Gonzalez bring this claim individually and on behalf of the Florida Subclass against Defendant pursuant to section 501.211, Florida Statutes.

132.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

133.    Plaintiffs Schriver and Gonzalez and the Florida Subclass members are "consumers" within the meaning of section 501.203(7), Florida Statutes.

134.    Defendant is engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce the Products, which constitutes trade and commerce as defined by section 501.203(8), Florida Statutes, and is therefore subject to FDUPTA.

135.    As alleged herein, Plaintiffs have suffered injury in fact and lost money as a result of Defendant's conduct because they purchased Products from Defendant in reliance on Defendant's representation that the ingredients in its Products were safe and effective and were not adulterated with benzene, a known human carcinogen.

136.    As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiffs Schriver and Gonzalez and the Florida Subclass to damages and relief under sections 501.201-213, Florida Statutes.

137.    Defendant has engaged, and continues to engage, in conduct that is likely to deceive members of the public. This conduct includes representing in its labels that its Products contain only the ingredients listed in the label, which is untrue, and failing to make any mention that the certain Products are adulterated with benzene, a known human carcinogen.

138.     By committing the acts alleged above, Defendant has engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

139.     Defendant's conduct is substantially injurious to consumers. Consumers are purchasing and using Defendant's Products without knowledge that the Products are contaminated with a human carcinogen. This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for the Products contaminated with benzene but for Defendant's false labeling, advertising, and promotion. Thus, Plaintiffs and the putative Class have been "aggrieved" (i.e., lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

140.     Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labeling of the ingredients and other information disclosing what is contained in the Products and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

141.     Further, Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiffs desire to purchase Defendant's Products in the future if they can be assured that the Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendant may continue to advertise, promote, and sell adulterated Products that deceive the public as to their ingredients, contents and/or safety. Plaintiffs are thus likely to again be wronged in a similar way. For example, if Plaintiffs or the Class members encounter Defendant's Products in the future and there is a risk those products still contain benzene, Plaintiffs or Class members may mistakenly rely on the product's label to believe that Defendant's eliminated benzene when they did not.

142.    Plaintiffs and putative Class members are entitled to recover their reasonable attorney's fees pursuant to section 501.2105, Florida Statutes.

143.    Further, Plaintiffs Schriver and Gonzalez and the Florida Subclass seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

144.    On behalf of Plaintiffs Schriver and Gonzalez and the Florida Subclass, Plaintiffs also seek an order entitling the Class to recover all monies spent on the Defendant's Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.

145.    In addition, the measure of restitution should be full refund of the purchase price insofar as the Products and their associated labels are worthless. But for Defendant's misrepresentations and omissions, Plaintiffs and Class members would have paid nothing for Products containing benzene. Indeed, there is no discernible "market" for an over-the-counter dry shampoo product that is adulterated with a known human carcinogen. As recognized by the WHO, "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended."[37] As a result, Defendant's Products are rendered valueless.

146.    Wherefore, Plaintiffs Schriver and Gonzalez and the Florida Subclass are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the Defendant's Products.

---

[37] *See* https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2 (last visited Nov. 2, 2022).

## COUNT VII

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS 501/1, *et seq.* and 510/2)**
**On Behalf of the Illinois Subclass**

147.    Plaintiff Allison realleges and incorporates by reference all preceding allegations as though fully set forth herein.

148.    Plaintiff Allison brings this claim on behalf of herself and the Illinois Subclass members against Defendant.

149.    Defendant, Plaintiff, and the Illinois Subclass are "persons" within the meaning 815 ILCS 505/1(c) and 510/1(5). Plaintiffs and the Illinois Subclass members are "consumers" within the meaning of 815 ILCS 505/1(e).

150.    At all times mentioned herein, Defendant engaged in "trade" or "commerce" in Illinois as defined by 815 ILCS 505/1(f), in that it engaged in the "advertising," "offering for sale," "sale," and "distribution" of any "property," "article," "commodity" or "thing of value" in Illinois.

151.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("IFCA") provides that ". . . [u]nfair or or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act'… in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2. The ICFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

152.    For the reasons discussed herein, Defendant violated and continues to violate ICFA by engaging in the deceptive or unfair acts or practices prohibited by 815 ILCS 505/2 and 510/2.

Defendant's acts and practices, including its material omissions, described herein, were intended to, likely to, and did in fact, deceive and mislead members of the public, including consumers acting and relying reasonably under the circumstances, to their detriment.

153.    Defendant repeatedly advertised on the labels for the Products, on its websites, and through national advertising campaigns, among other items, that the Products were and are safe, suitable, and fit for their intended purpose use and purpose. Defendant failed to disclose the material information that the Products contained or materially risked containing carcinogenic benzene.

154.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained or materially risked containing carcinogenic benzene.

155.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Allison and the Illinois Subclass members suffered damages by purchasing the Products in reliance on Defendant's statements because they would not have purchased the Products had they known the truth, and they received a product that was worthless, and/or worth less, because it contains or materially risks containing carcinogenic benzene.

156.    Defendant's unlawful conduct is continuing, with no indication of Defendant's intent to cease this fraudulent course of conduct, posing a threat of future harm to Plaintiff Allison, the Illinois Subclass, and the general public. Thus, Defendant's unlawful acts and practices complained of herein affect the public interest.

157.    Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiff and the Illinois Subclass seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the ICFA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Classes alleged herein, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.      For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Classes and Plaintiffs' attorneys as Class Counsel;

B.      For an order declaring the Defendant's conduct violates the causes of action referenced herein;

C.      For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and

H.      For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiffs and Class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), of all issues so triable.

Dated: November 11, 2022.                    Respectfully submitted,

*/s/ Kristen Lake Cardoso*
Kristen Lake Cardoso (FBN 44401)

Jeff Ostrow (FBN 121452)
Jonathan M. Streisfeld (FBN 117447)
**KOPELOWITZ OSTROW FERGUSON**
**WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
cardoso@kolawyers.com
ostrow@kolawyers.com
streisfeld@kolawyers.com

*Attorneys for Plaintiff and the Putative Classes*